(C.D. 3873)

T. D. DOWNING COMPANY *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 28, 1969)

*Walter E. Doherty, Jr.,* for the plaintiff.

*William D. Ruckelshaus,* Assistant Attorney General (*Owen J. Rader* and *Herbert P. Larsen,* trial attorneys), for the defendant.

Before RAO and FORD, Judges, and DONLON, Senior Judge

DONLON, Judge: The merchandise at bar, imported by plaintiff on September 4, 1965, from the United Kingdom for Jaco Devices, Inc., the ultimate consignee, was described in the entry as parts for machine tools, classifiable under TSUS item 674.53. The merchandise was so classified in liquidation. The protest before us claims that classification properly should be as machine tool accessories, under TSUS item 674.55.

The provisions of the respective TSUS enumerations and the relevant general interpretative rule are as follows:

Schedule 6, part 4, TSUS
　Subpart F. – Machines for Working Metal, Stone, and other Materials

＊　　＊　　＊　　＊　　＊　　＊　　＊

Work and tool holders and other parts of, and accessories used principally with, machine tools; tool holders for the mechanical hand tools provided for in items 651.27, 674.70, and 683.20:

＊　　＊　　＊　　＊　　＊　　＊　　＊

Other:
　Parts:

＊　＊　＊　＊　＊　＊　＊

Other:

＊　＊　＊　＊　＊　＊　＊

| | | | |
|---|---|---|---|
| 674.53 | Other parts___ | 14% | ad val. |
| | Accessories: | | |
| 674.55 | Machines _____ | 10% | ad val. |

10. General Interpretative Rules. For the purposes of these schedules—

＊　　＊　　＊　　＊　　＊　　＊　　＊

(ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

The official papers are in evidence. They show a customs invoice description of the merchandise as controlled oilers, press tool feeders, and straighteners.

There is a presumption, not rebutted, that the collector correctly found that the punch presses, of which the oilers, feeders and straighteners at bar are either parts or accessories, are machine tools within the schedule 6 definition. Indeed, it was stipulated in court that they are chiefly used with machine tools. The sole controversy here litigated is whether they are parts, as classified, or accessories, as plaintiff claims.

Mr. Albert E. Cotton testified for plaintiff. He identified himself as formerly the treasurer of Jaco Devices, Inc., which is a manufacturer and distributor of punch press accessories. At the time of trial, and since October 5, 1967, he has been employed by Jaco as consultant. However, he has been with Jaco since 1950.

As to his work experience, he began as an indentured apprentice tool and die maker with Vickers Limited, in London, in 1916; came to the United States in 1920; worked as a tool and die maker for various employers, including E.W. Bliss Company, manufacturers of punch presses; for about nine years, during the depression, he was not employed in the punch press trade but returned to it in 1939. During the years of World War II, he worked first in the ship building industry and later he was employed by the United States Government as an industrial specialist, speeding up the manufacture of landing craft. He next developed his own die casting business, and in 1950 he sold this to Jaco Corporation, then newly formed "for the purpose of selling to the punch press trade, in the light metal stamping end of it, specialties which could be accessories to the basic machine tool which is the punch press." (R.7.)

He has frequently operated punch presses. He has designed, manufactured and distributed punch press accessories. As to the merchandise at bar, Mr. Cotton testified that he ordered it, received it and paid for it.

Exhibit 1 is a piece of literature which Mr. Cotton designed, with the assistance of an advertising agency, and caused to be printed for Jaco. In this advertising piece, the three items of merchandise at bar are enumerated. Witness marked as "A" a coil stock straightener, as "B" a controlled oiler, and as "C" a Jacomatic stock feed; and he testified that these were representative of the several articles of imported merchandise described in the customs invoice.

Exhibit 2 is a Jacomatic feed. Exhibit 3 is a straightener. Exhibit 4 is an oiler. In all material respects, except size, these exhibits are similar to the merchandise at bar.

While there has been judicial determination, under TSUS, as to what articles are "parts", none of the cases thus far decided appears to have involved the competing provisions of TSUS here before us. There was no tariff enumeration for machine tool accessories in the Tariff Act of 1930. Indeed, it may be that the machine tool accessories

provision is the sole enumeration for accessories in the new tariff schedules. We are cited to no other.

The only guide to Congressional intention, in establishing this accessories classification, is a statement in the Tariff Classification Study, a report to the President and to the Chairmen of the House Committee on Ways and Means and the Senate Committee on Finance, made by the United States Tariff Commission pursuant to Congressional directive in the Customs Simplification Act of 1954.

In reporting on schedule 6, part 4, the Commission's explanatory note says:

> "There are a number of jigs, fixtures, and other subsidiary devices or accessories which are principally used in connection with machine tools. Such devices, although principally used with machine tools, are not parts of any particular tool. Item 674.55 would cover such accessories which are machines at the rate of 12.5 percent ad valorem which is the approximate arithmetical average of the existing rates in the "basket" provisions of paragraphs 353 and 372. Item 674.56 would cover "other" accessories at the rate of 19 percent ad valorem which is the rate presently applicable under paragraph 397 to most jigs, fixtures, and other accessories which are not in themselves machines." [Pp. 272, 273.]

It is axiomatic that if the articles at bar are accessories, whether in themselves they are or are not machines, the specific provision will prevail over the general provision for parts. We set aside, for the time being, the issue as to whether these articles are machines, in order to resolve the primary issue as to whether they are machine tool accessories.

The first test seems to be whether such devices as those at bar, which are principally used in connection with machine tools, are solely or chiefly used with a particular machine tool. The record seems clear that they are chiefly, if not solely, used with punch presses, that is to say, with a particular machine tool. They are used either as a fixture permanently attached to the punch press or attached to a press plate designed for use with a punch press. Any other use, so far as the record discloses, is an incidental or fugitive use.

The leading case under the Tariff Act of 1930 is *Gallagher & Ascher Company* v. *United States*, 52 CCPA 11, C.A.D. 849 (1964), reversing *idem*, 51 Cust. Ct. 232, Abstract 68052 (1963). The trial court had held that auxiliary heaters imported for installation in Volkswagen automobiles were accessories. Our appeals court held that they were parts.

The record in *Gallagher & Ascher* shows that the imported heaters were optional equipment; that the automobiles were equipped with conventional heaters and could be operated without the optional heaters; and that the optional (imported) heaters served a useful purpose by contributing as de-icers to the safe operation of Volks-

wagens and also increased the comfort of those who rode in the automobiles in winter in a considerable number of our states.

Our appeals court, after exhaustive review of prior decisions, including *United States* v. *Willoughby Camera Stores, Inc.*, 21 CCPA 322, T.D. 46851 (1933); *United States* v. *Antonio Pompeo*, 43 CCPA 9, C.A.D. 602 (1955); and *Trans Atlantic Company* v. *United States*, 48 CCPA 30, C.A.D. 785 (1960), said:

> Most significant in the overwhelming weight of its impact on the factual situation instantly presented and the rule in *Willoughby* per se, and as applied by the Customs Court, is this court's summary analysis of the line of cases cited above. This court in *Trans Atlantic* said:
>
>> In all of these cases, as in the present case, there was an option on the part of the purchaser of the article to use it either with or without the imported auxiliary devices. When the purchaser elected to use the article with such auxiliary devices, the devices were held in each case to be parts of the article for which they were designed and intended for use. In all these cases the articles could have been used without the imported auxiliary device. In these cases the court considered the function of the auxiliary part when the purchaser elected to use it as a part of the article and did not consider it determinative that the article could function without the auxiliary part.
>
> Here, as in *Pompeo*, the imported articles are dedicated to a sole specific use and "for no other use." Here, as in *Trans Atlantic Company*, the imported article serves a useful function. In *Trans Atlantic* the brackets mounted on the door frame were necessary to the efficient operation of the door closer. Here the record supports the view that the auxiliary heater contributed to the safe and efficient operation of the Volkswagen in frigid temperatures in relation to the comfort of its occupants and in aid of the indispensible safety factor of vision by assisting in the removal of ice from the windshield.
>
> The facts of record that the auxiliary heater was optional equipment; that the Volkswagen came equipped with a conventional heater and that the automobile could be operated without the additional heater, are not of such vital import as to be determinative of the issue. When once attached to the automobile to which it was solely dedicated and in the manner disclosed, and in the performance of the function for which it was designed, it became a part of the automobile within the purview of paragraph 369(c) of the Tariff Act of 1930, as modified. [P. 16.]

The facts of record here are that use of the feeder, straightener and oiler (the articles at bar) with the punch presses is optional; that the punch presses can be operated without these units when the work to be performed does not call for automatic feed, *i.e.*, where sheet metal rather than coil stock is to be run through; that the three

imported devices are attached to the punch press, either permanently or on a press plate used in the press, to permit the press to operate on coil stock; and that in order to use the press with sheet stock, it is necessary to detach them or remove the plate press.

The feeder, straightener and oiler serve a useful function in that they eliminate manual labor and increase the rate of production, safety and convenience with which a punch press can operate with coil stock.

The test laid down by our appeals court in the *Gallagher & Ascher* case, *supra*, appears applicable here. While the devices used with the punch press are optional equipment, they serve a useful function, to which they are solely dedicated. They have no other chief use.

We conclude that these articles are not accessories, in that they are, within the specifications of the parts classification established by our appeals court, parts of a particular machine tool, the punch press. Therefore we need not consider whether they are or are not, in themselves, machines.

The protest claim is overruled. Judgment will be entered accordingly.